## CARPENTER *vs.* CARPENTER and wife.

1. Services rendered by a wife in the course of the discharge of her duty as a wife, do not, nor does the money she brings to her husband at their marriage, constitute a valid consideration for a conveyance of lands to her, as against the husband's creditors.

2. A conveyance made by a debtor, with a view to his future indebtedness, and to protect his property against it, is void as to creditors.

3. Representations made by a debtor in the presence of his wife, of the value of his property, which at the time, and for several years, had been in his wife's name, by voluntary conveyance from him, by which representations another is induced to suppose he is the owner of the property, and to bind himself for the payment of moneys which he was subsequently obliged to pay, estops the wife from setting up such title as against such creditor's demand.

On final hearing on pleadings and proofs.

*Mr. Griggs,* for complainant.

*Mr. Cochran* and *Mr. Coult,* for defendants.

THE CHANCELLOR.

The complainant is a judgment creditor of the defendant, John S. Carpenter, his brother. The judgment was recovered in the Supreme Court of this state, on the 20th of February, 1872, for $4302.33. Execution against the defendant's goods and lands having been duly issued upon it, it was duly returned unsatisfied, for want of property whereon to levy. The bill is filed to subject to the payment of this debt, a farm in Sussex county, which the judgment debtor owned on the

8th of November, 1866, and which on that day he and his wife, the other defendant in this suit, conveyed, in fee, to their daughter Susan, by whom, on the same day, it was conveyed, in fee, to her mother.

The complainant alleges, that those conveyances, by which the title to the property was vested in the defendant, Mary Ann Carpenter, by whom it is now held, are fraudulent and void as to him, on the ground that they were made with intent to hinder, delay, and defeat the creditors of John S. Carpenter. The latter, who was a farmer, living on, and tilling the farm in question, on or about the 1st of April, 1866, contracted with one John R. Baker, for one-half of Baker's right to manufacture a patented composition called "railroad box metal," or "union metal," and one half of Baker's interest in the net profits of the manufacture thereof. For this interest in the license and profits he paid Baker $6000. This money he raised by temporary loans, which he subsequently in the same year paid with that amount raised on a mortgage, given by him to Carpenter Howell, upon the farm in question. On the 9th of June, 1866, an agreement in writing was signed by Baker and delivered to John S. Carpenter, by which the former acknowledged the receipt of the $6000, and in consideration thereof covenanted that he would assign and pay over to the latter, one-half of his interest (one-sixth) in the profits of a co-partnership business for the manufacture of the metal, then carried on by him and Alfred L. Hovey. The mortgage to Carpenter Howell, appears to have been given prior to the 8th of November, 1866. It does not appear that John S. Carpenter contracted any further debts or liabilities in the business, until some time in the winter of 1867, when the co-partnership above alluded to, having come to an end, Baker proposed to him to enter into co-partnership with him in the manufacture of the metal, the business to be carried on at Jersey City, to which Carpenter agreed. They entered into co-partnership, accordingly, and carried on the business, Carpenter contributing to the capital, money which he, from time to time, obtained by discounts from the First

National Bank of Warwick, on his promissory notes, endorsed by James A. Thompson, the brother of his wife, until in the spring of 1869, he was indebted to the bank for such discounts, to the amount of about $7000. For the payment of this money, the bank was anxious. About that time, Thompson proposed to him that he should divide the liability which he, Thompson, had incurred for him, by getting his brother, the complainant, to endorse his, John S. Carpenter's, note for one-half of the amount of the indebtedness, while Thompson would remain liable for the other half. Approving of the proposition, John S. Carpenter proceeded to get his brother's endorsement, and on the 20th of March 1869, went with his wife, for that purpose, to the house of the latter, in Orange county, in the state of New York, and there, by dint of persuasion, obtained the desired accommodation, and induced the complainant to make a joint note with him for $3500, payable at six months, to the order of Thompson, to whom John S. Carpenter delivered it. This note was not paid by John S. Carpenter at its maturity. Thompson sued the complainant upon it, and obtained judgment, which the latter was compelled to pay. He then brought suit against John S. Carpenter, for the amount of the note and interest, and recovered the judgment above stated.

The conveyances by which John S. Carpenter conveyed his farm to his wife, were wholly voluntary. Although he alleges in his testimony, that there was a consideration, that he got $6000 for the property, yet it appears that there was, in fact, none. His explanation of his testimony on this point is, that the $6000 were paid by the assumption by his wife of the mortgage for that amount, which was on the property when the conveyance to her was made. The wife of John S. Carpenter, in the answer, states that no money was paid by her to her husband on the conveyance, and that it was not agreed or intended that there should be any. The answer, indeed, states that the property was principally the result of the joint industry and toil of the defendants, during a great many years in the farming business, and that, when they

commenced their married life, the husband had only about $3000, and that the wife had about $1000, which she had received from her father's estate, and which she placed in her husband's hands, and that that was all the capital on which they commenced business, and all they ever had, except what they made by their farming operations, but it does not set up this money and her services as the consideration for the conveyance. And if they had been set up, they would not have availed the defendants to sustain the deed as against the complainant. It appears by her husband's testimony, that of the money she received from her father's estate, about $300 or $400 were received very soon after they were married, and were expended in furniture and fixtures for the house on the farm, when they first built and moved into it, which was about forty-two years ago. Of the remainder, about $200 were got about ten years thereafter. This money was used to pay for buildings put on the farm, a cow-house, grain-house, &c., and the residue $600, was received afterwards, and was used in paying indebtedness on the farm, the title of which was then in the husband's name. Her services were rendered in the course of the discharge of her duty as a wife. Neither they, nor the money she brought to her husband, would have constituted a valid consideration as against her husband's creditors. *Skillman* v. *Skillman,* 2 *Beas.* 403 ; *Belford* v. *Crane,* 1 *C. E. Green* 265 ; *Cramer* v. *Reford,* 2 *C. E. Green* 367 ; *Annin* v. *Annin,* 9 *C. E. Green* 184.

The husband in his testimony, states that the object of the transfer of the farm to his wife, was that it was better for him to have the money than the farm ; that he got $6000 for the transfer of the farm ; that he got the money from Carpenter Howell, that is, that his wife was to pay the $6000 mortgage he had given to Howell on the farm ; that she took the title subject to the payment of that mortgage ; that he was not urged by his wife to transfer the farm to her before he did it ; that he consulted her about it before he did it ; that she wanted the farm, and he was satisfied to take the $6000 for it. He adds, that he does not remember that anything was

said about saving the farm for his wife and children; that his wife was dissatisfied about his engaging in the metal business; he supposes she thought he might lose money in it; that she supposed farming was good enough. He further says that he transferred the stock and farming fixtures to her; that it was all in the same contract, and for the stock he had the proceeds of the farm, (meaning, he says, the proceeds of the farm after it was conveyed to his wife,) and got the money out of them. The answer treats the conveyance as wholly voluntary. The wife, answering for herself, says that she was not, at the time of the conveyance, informed by her husband of the exact nature of the purchase he had made of Baker, or the amount he had agreed to pay therefor, but that she understood and believed, at the time, that he had purchased some interest in a patent-right, out of which he claimed he would make a large sum of money, and that she ascertained that he was using large sums of money to pay for that interest, and she and her children became alarmed on account of his transactions, and feared that he would be drawn into other speculations, by which the property which he then owned would be wasted; that she had no confidence in the value of the purchase which he had made, so far as she knew the nature of it, though he was apparently well satisfied with it, and seemed to think he would realize large profits from it; that she and her children and friends consulted together about the matter, and concluded that they would, if possible, get him to convey the property to her, so that he would not make any further investments of the kind that she supposed and believed that he had made. She further says, her sole purpose was to prevent her husband from going further into speculation, and to save the property to herself and children by preventing him from making any further purchases of that character; that she got her brother, James A. Thompson, who had been the principal endorser for her husband, to speak to him about making the transfer, and that her husband at once expressed his willingness to do so, and very soon afterwards they went to Newton and the

transfer was made. The husband, answering for himself on this subject, says, that he transferred the title to his wife to quiet her fears, and satisfy her and his children, and not with any intention or purpose to cheat or defraud any person, and with no intention or expectation of creating any future indebtedness, or contracting any future liability. In his testimony, it will have been observed, he takes different grounds, alleging that he sold the farm to his wife; that she did not urge him to convey it to her, that she wanted the farm, and he was satisfied to take $6000 for it; and he adds, that he does not remember that there was anything said about saving the property for his wife and children. The daughter, to whom the conveyance was made for the purpose of conveying the property to her mother, testifies that her uncle, James A. Thompson, was the first one, and she believes the only one, who suggested to her father the transfer of the farm to her, and from her to her mother, and she says she does not believe he gave any reason for it; that she never heard of any.

She further says, that her mother and the children never, to her knowledge, asked her father to make the transfer, nor did her mother, to her knowledge; that the witness was spoken to about the transfer by her father, not over a month before it took place, and that he then said that her mother was so dissatisfied, he was going to do it to satisfy her mind, because she found a great deal of fault with him because he had expended the $6000. Her father, she says, had, at the time, other speculations in anticipation, to all of which her mother was opposed. She says, that the object of the transfer (which was of the farm and all his personal property there, the latter valued by him at $3000,) was, as she understood it, to prevent her father from making any more purchases of patent rights, lands or anything else; that she understood that this transfer would prevent her father from making any more purchases, because they thought he would not use the profits of the farm when he did not have control of it; that he would not listen to them before, and they

thought after that he could be compelled; that her mother said she did not know anything about these speculations, and did not want to know anything about them. She says her mother took a dislike to Baker, and said, not a cent of her property should go to Jersey City; that her husband could take his part and do what he had a mind to do with it; hers she was going to keep on the farm. John S. Carpenter testifies, that he first talked about transferring the farm, about a month before he did it, and that Thompson first suggested it to him. It is evident from the testimony, that the object of the conveyance was to protect the property of John S. Carpenter against his creditors, to put it beyond the reach of the creditors with whom it was contemplated he would probably contract debts in the hazardous business in which he was engaged, or in those on which he would probably enter. He says in his testimony, that he commenced the business with Baker in 1866, and continued in it from May of that year, until the latter part of the winter of 1867, and that in the latter part of April or first of May of that year, he engaged in the business in Jersey City; that before that, the business had been carried on in Williamsburgh, and it was a mere removal from the latter place to Jersey City; that he and Baker had got the business themselves and removed it to Jersey City, and that it was an enlargement of the business. So that when he made the conveyance to his wife, he was carrying on the business in Williamsburgh, and he continued in it from thence up to the latter part of April, 1869, about a month after he obtained the complainant's signature to the note.

The transfer, as before remarked, included not only the farm, but all his personal property there, valued by him at $3000. So that he conveyed to his wife, all his personal and real property, except that which he had invested in the hazardous enterprise in which he was engaged. The evidence leads to the conclusion, that this transfer was made with a view to his future indebtedness, and to protect his property against it. But there is another important consideration in

the case. When the note was signed by the complainant, he was unaware of the fact of this conveyance. John S. Carpenter and his wife, went together from the farm in Sussex, to the house of the complainant, in the state of New York. The object of this visit was to obtain the signature of the latter to a note for one-half of the indebtedness for which Thompson was alone bound as surety for John S. Carpenter. The proposition that this should be done, came from Thompson. By this means, he proposed to devolve half of the burden he had assumed, on the complainant. The condition of John S. Carpenter's affairs had become desperate. The bank was urging payment, and in fact, according to John S. Carpenter's testimony, he abandoned the business in about a month from the time he obtained his brother's signature to the note. It proved a total failure. It is not probable that his wife was not fully aware of the object of her husband in this visit to his brother. Nor is it probable that she was not aware of the fact that the complainant made and signed the note. Her husband says, she was present when the note was drawn and signed. The complainant and his wife both swear that she was there, and in a position to hear the conversation which took place in regard to it. There was no secrecy in the matter. Her husband was urging the complainant to make the note, and he was reluctant to do so and declined, but finally appealed to his wife, and she, with reluctance, gave her consent that he should sign it. The wife of John S. Carpenter must have heard the representations made by her husband to the complainant, in regard to his pecuniary ability. Among these was the statement that his property at home, meaning the farm in question, was worth twice as much as the amount of all his debts. Both the complainant and his wife swear that this was said by John S. Carpenter to the complainant, in the presence of the wife of the former.

It is clear that the complainant had no actual knowledge at that time, nor until long afterwards, of the conveyance which had been made, nor had he any suspicion when he signed the note, that John S. Carpenter was not still the

owner of the farm. Had he known of, or suspected the conveyance, he would not have signed the note.

John S. Carpenter, after the conveyance to his wife, remained in possession of the farm and personal property, just as before that transaction, continuing to exercise the same acts of absolute ownership over them as before.

There must be a decree for the complainant. The conveyance from John S. Carpenter and his wife, to his daughter, Susan Carpenter, and the deed from her to her mother, Mary Ann Carpenter, will be declared fraudulent and void, as against the complainant's judgment.